Kathleen CAPALDI

v.

Caspar WEINBERGER, Secretary of
Health, Education and Welfare.

Civ. A. No. 73–2325.

United States District Court,
E. D. Pennsylvania.

Feb. 24, 1975.

Paul L. McSorley, Philadelphia, Pa.,
for plaintiff.

Robert E. J. Curran, U. S. Atty., Paul
E. Holl, Asst. U. S. Atty., Philadelphia,
Pa., for defendant.

OPINION AND ORDER

BECHTLE, District Judge.

This is an action under § 205(g)
of the Social Security Act, as amended,
42 U.S.C. § 405(g), seeking judicial re-
view of a final decision of the Secretary
of Health, Education and Welfare
("HEW").[1] That decision denied the
plaintiff's application for a period of
disability and for disability insurance
benefits based on the finding that the
applicant had failed to establish that she

1. The administrative law judge's decision of
April 26, 1973, after a *de novo* hearing, be-
came the final decision of the Secretary
when the Appeals Council approved the deci-
sion on August 15, 1973. Hodgson v. Cele-
brezze, 312 F.2d 260, 261 n. 2 (3rd Cir.
1963).

was disabled within the meaning of the Act at any time prior to March 31, 1959, the date when her insured status under the Act expired. The matter is before us on the Secretary's motion for summary judgment for affirmance of the decision and dismissal of the complaint on the ground that there exists no issue concerning any material fact. The only question before the Court is whether the Secretary's final decision is supported by substantial evidence and is in accordance with applicable law and regulations.

Plaintiff was born on November 25, 1938. After completing eleven years of schooling, she held three jobs during her short working career. The first was as a secretary-receptionist from February of 1955 to May of 1957; the second was as a keypunch operator from May of 1957 to August of 1957; and, the third was also as a keypunch operator from August 12, 1957, until December 20, 1957. The basis for the termination of her last employment was given as "absence caused by illness due to pregnancy." She has not returned to work since then. She married on October 26, 1957, and has three children who were born, respectively, in May, 1958; May, 1963; and April, 1965. She filed her application for disability benefits on April 19, 1971, based on her own wage record, stating that she became unable to work in January of 1958, when she was age 19. Her explanation for the 13-year period between the claimed time of disability and the filing of the application was, in addition to the fact that she did not know she had the right to file an application for disability benefits under the Social Security Act, that she had felt she would be able to resume work until her doctor told her she was completely unable to work.

There is no dispute that she met the special insured status or earnings requirement of the Act and that such status expired on March 31, 1959. A condition of qualifying for benefits is that the applicant must establish that he or she became disabled within the meaning of the Act at a time beginning prior to the expiration of the insured status period. The burden is not on the Secretary to make an initial showing of non-disability.[2] Dr. Norman Learner, a specialist in internal medicine since 1941 and clinical professor of medicine at Temple University School of Medicine, was called by the Secretary to testify as an expert medical witness. He is referred to in the record as a medical adviser to the Secretary and as an "impartial" medical expert. He had not examined nor treated the plaintiff and had not seen her prior to the *de novo* hearing before the administrative law judge on October 18, 1972. He testified, among other things, after reviewing exhibits numbered 9 through 35 and listening to plaintiff's testimony, that she could not have been gainfully employed after January 17, 1964, the first time she visited Dr. Edgar C. Smith, because of her physical impairments. A medical condition having its beginning during the covered period, but which may have become disabling after the earnings requirement is last met, may not serve as a basis for qualifying under the disability provisions of the Act.[3] The critical period in which plaintiff must have shown that she was disabled is the time before April 1, 1959, the day after her insured status ended.

In her application, she claimed that partial stomach removal, cervical cancer, deafness in one ear, chronic kidney disease and recurring surgery prevented her from working, and that she became unable to work beginning in January of 1958 because of her disability. She testified that she had been under the care of numerous physicians and that pain and weakness had limited her activities. The Secretary found that the

2. Reyes Robles v. Finch, 409 F.2d 84, 86 (1st Cir. 1969); Corson v. Weinberger (E.D. Pa.1974).

3. De Nafo v. Finch, 436 F.2d 737, 739 (3rd Cir. 1971).

medical evidence of record does not establish that plaintiff's physical impairments were of such severity as to have prevented her from being substantially gainfully employed on or before March 31, 1959. We hold that the Secretary's findings are not supported by substantial evidence; and his motion for summary judgment must, therefore, be denied.

The stomach operation for the removal of a pre-pyloric ulcer occurred in April of 1970. The medical evidence did not show that she had excessive weight loss, malnutrition, or serious stomach disorder before March 31, 1959. This condition may not serve as a basis for finding disability in the critical period. However, the record does show the presence of ear and urinary tract disorders on or before March 31, 1959, and thereafter.

Plaintiff testified at the *de novo* hearing that she had middle ear trouble since early childhood and that she went to the Children's Hospital of Philadelphia about every other day for about eight years and that a mastoidectomy was performed there upon her right ear back in 1945. Although the hospital records as to her visits and treatment were unavailable, they did show she had been a patient at the Children's Hospital starting in 1944. [Transcript p. 169, Ex. 32] Regarding her vertigo, she stated that she was not astonished by the symptom itself because she had it "all my life" and that she would have dizzy spells every two weeks or once a month, that she would faint without warning, that the spells would last for several seconds, and that they would cause her to fall if she were standing at the time. She also stated that the reason for her three employment dismissals was because of her dizzy spells. She told the administrative law judge that her hearing was practically gone in her right ear and very little remained in the left and that she was aided in conversation by lip reading. She also added that since 1945 her right ear had been operated upon at least four more times in an effort to stop the drainage and remove the cause of the vertigo symptom.

Reports, in letter form, from some of her treating doctors corroborated her testimony regarding her ear trouble. A report of an ear doctor [Nicholas F. Hoffman, Transcript p. 179, Ex. 36] dated November 29, 1972, revealed that she had office visits in 1955, 1957 and for the last time in 1961; that during the 1957 visit her main complaint was dizziness of two months duration, and that since she had a middle ear disease the symptom of vertigo could not be considered unusual or highly significant.[4] Another ear doctor [Felice J. Santore, Transcript p. 170, Ex. 33] wrote that in 1964 a tympano-mastoidectomy was performed upon her for otitis media and conductive deafness, and that she complained of vertigo. Another more detailed report of three medical associates [Emil P. Liebman, Bernard J. Ronis and Max Lee Ronis, Transcript p. 168, Ex. 31], who are ear, nose and throat specialists, discloses that she had undergone a mastoidectomy in 1945, that after another operation was performed around 1964 in an attempt to improve her hearing the ear began to drain, and that sometime later a radical mastoidectomy was done, but the ear continued to drain. An audiometric evaluation was done at the initial visit, and a maximum conductive hearing loss was noted on the right, and a severe conductive loss noted on the left ear. She complained of intermittent unsteadiness and dizziness which is not uncommonly seen in a patient with chronic ear infections; and because of inadequate drainage, a revision of the right radical mastoidectomy was carried out in February of 1971. The report concluded as follows:

"She does have a considerable conductive hearing loss bilaterally, and according to her history, which certainly appears to be substantiated by her physical examination, she has had a

4. This report was designated as Exhibit No. 36 and was received in evidence after the record of the case was reopened on March 26, 1973.

hearing loss for many years, and drainage from the ear for many years. It would certainly be our opinion that it would be most difficult for her to be employed in any type of work where normal hearing is needed, because she does have a considerable loss. In addition chronic infection from the previously operated ear would be a considerable handicap to her * * * " [Transcript p. 168, Ex. 31]

The record also discloses a long history of treatment for chronic urinary tract disorders exacerbated by pregnancies. The medical evidence failed to disclose a cancerous condition, but rather multiple infections. A general practitioner [Rocco P. Sciubba, Transcript p. 155, Ex. 18] advised that he treated the plaintiff in 1957[5] for recurrent cystitis (inflammation of the bladder). An ophthalmologist reported that he had taken care of her for the years 1958 and 1959 and she was suffering from cystitis, nephritis (inflammation of the kidney structure) and hydronephrosis (cystic distension of the kidney caused by the accumulation of urine in the kidney pelvis as a result of obstruction to outflow and accompanied by atrophy of the kidney structure and cyst formation); and since she was not responding, he referred her to a urologist and gynecologist for treatment. A gynecologist and obstetrician [Anthony A. Nardone, Transcript p. 160, Ex. 23] stated that according to his records he saw her in January of 1959 and an examination revealed the presence of pyelonephritis (inflammation of both the pelvis and the substance of the kidney) and that the condition, according to her past medical history, had existed during her previous pregnancy in 1958; and he recommended that she visit Dr. Edgar C. Smith, an internist whose office was approximately five miles from her home. Still another ophthalmologist [Larry J. Starer, Transcript p. 95, Ex. 9] advised that she was admitted to Taylor Hospital, Ridley Park, Pennsylvania, in the latter part of January, 1961, with the chief complaint of recurrent episodes of cystitis and left costo-vertebral angle pain since the birth of her child in May of 1958; and the discharge diagnosis was cystitis, urethritis (inflammation of the urethra), trigonitis (inflammation of the trigone of the bladder) and cervicitis (inflammation of the cervix uteri).

Two urologists [Drs. Wallace O. Lecher and William D. Ziegenfus, Transcript p. 171, Ex. 34] stated in a letter dated June 21, 1972, that in their opinion plaintiff's present condition of pyelonephritis and cystitis may represent a continuing disability from the first pregnancy in 1958.

Plaintiff did not produce any results of laboratory studies or clinical findings as to the existence and severity of her physical impairments prior to March 31, 1959. She did testify of physical complaints, visits to physicians, and hospitalizations during and immediately after the critical period. She related that she visited a Dr. Pepper once every three weeks starting in January of 1958 and a Dr. Eisenberg, a gynecologist, once every six weeks during her first pregnancy and until six months after her first child was born in May of 1958. In early 1958, she complained of cystitis, flank pain, blood in her urine, and dizzy spells different from those brought on by her ear problem because they made her lose consciousness for several seconds. Concerning her complaints of dizzy spells, she said Dr. Pepper advised her that the vertigo was probably caused by her ear trouble and that it was something she had to live with. She did not know that she was suffering from various other urinary tract ailments besides cystitis until after her first child was born, since complete tests could not be performed until then. Because of illness and weakness after giving birth, she had to stay at her mother's house for about four months. While there, technicians were required to take her hemoglobin count periodically, which was low from intermittent loss of blood. She said she

5. Plaintiff testified she saw this physician in November of 1957.

had to be rushed to the accident dispensary of the Osteopathic Hospital on four occasions during that time as the result of kidney problems and high fevers. Around the end of 1959, she began to visit an internist [Larry J. Starer, M.D.] whose office was within walking distance of her home instead of the one recommended by her obstetrician. From 1958 to 1964, she did some sparce housework like cooking, dusting, and making the beds when she felt up to it. Most of the time, however, she was helped by relatives, neighbors and charitable organizations.

Dr. Learner stated that in his opinion the plaintiff did indeed have recurrent urinary tract infections on or before March 31, 1959; and the evidence is ample to indicate that the condition in her right ear was severe during that period, and that middle ear disease such as she had commonly causes vertigo.[6] However, on the basis of the exhibits in evidence and without more detailed medical evidence to corroborate her testimony, he was unable to venture an opinion one way or the other as to the severity of her urinary tract diseases on or before March 31, 1959. As a result, he was unable to say that she was unable to work prior to January 17, 1964. The Secretary did not present any other medical expert witness or other evidence.

In his opinion, denying benefits, in which he found that the medical evidence did not establish that plaintiff's impairments were of such severity as to be disabling on or before March 31, 1959, the administrative law judge said:

"The claimant's attending physicians during the critical period merely furnished general statements, with no specific information being supplied as to the extent, severity, chronicity and recurring nature of her disorders . . . Similarly, the allegations of the claimant as to the severity of her condition are not persuasive without corroboration by substantive medical evidence . . . ." [Transcript p. 13]

On March 26, 1973, the administrative law judge permitted the record in the case to be reopened and to receive in evidence Exhibits 36 and 37. Exhibit 36, referred to earlier, is the report of Dr. Nicholas F. Hoffman, an ear doctor. Exhibit 37 is the notarized report of Dr. Edgar C. Smith, dated February 21, 1973. In that report, Dr. Smith gave as his considered opinion that the conditions for which he treated plaintiff during the years 1964–1973 could not have been at the stage they were when he treated her had they not had an incipience sometime prior to 1959 and that such conditions even then prevented her from engaging in any useful occupation.

The record does not show whether Exhibit 37 was shown to Dr. Learner and, if so, whether he was able to form an opinion as to the severity of her condition in the critical period. It appears that, with the admission of this report into evidence, plaintiff made out a *prima facie* case for entitlement to benefits. For example, see, Stark v. Weinberger, 497 F.2d 1092, 1097–1099 (7th Cir. 1974). Dr. Smith may have been mistaken in his evaluation of plaintiff's impairments. Nevertheless, the Secretary may not arbitrarily disbelieve or ignore his report. Kennedy v. Richardson, 454 F.2d 376 (3rd Cir. 1972), after remand, 369 F.Supp. 336 (E.D.Pa.1974), opinion of Chief Judge Joseph S. Lord, III. The Secretary is required at least to present medically acceptable evidence contrary to Dr. Smith's evaluation. Buchanan v. Richardson, 320 F.Supp. 927 (W.D.Va.1970). This has not been done here.

Accordingly, the motion of the Secretary for summary judgment will be denied. The decision of the Secretary will be vacated and the matter remanded to him for appropriate action.

---

6. A diagnosis of a claimant's impairments may properly be made several years after its actual onset. Stark v. Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974). Also see, Wise v. Richardson, 330 F.Supp. 412 (M.D.N.C. 1971).